The opinion of the court was delivered by
Duncan, J.
John Keen the elder bequeathed the residue of his personal estate in the following words, “ I give to my son, Jacob Keen, one half thereof, to be paid to him one year after my decease. and the other half I order my executors to put to interest on good security, and one half of the interest therefrom I give tq be applied to the support and education of the children qf my son Samuel, until they respectively arrive to fourteen years of age, and the interest arising afterwards, I give to the said children of my said son Samuel, in equal parts, or shares, as they respectively arrive to lawful age. The other half of the said interest, I give tq> my said son Samuel, to be paid to him annually during his life; and after his decease, I give the principal, so put to interest, to the children of the said Samuel Keen, in equal parts or shares. John Keen, the surviving executor, took possession of all the testator’s effects. On the settlement of the guardianship account, the Orphans'1 Court decreed that he shouW be charged with the following sums: [His Honour here referred to the account;] and it is from this decree the appeal is taken. It is admitted, that ño part of thes.e items ever came to the hands of the appellant; but it is alleged, that these sums were lost by his negligence and inattention, in not calling the executor to account, and compelling him either to put the money out on good security, until his wards came of age, or to pay it into his own hands. The counsel for the appellees have put one construction on this will, that the principal, on the death of Samuel, vested in and was payable immediately to his children; — while, on the part of the appellant, it is contended, that the interest only was payable to them, until they arrived at full age.; and certainly this will ip not free from obscurity. It .is a plausible argument, that the *322 death of Samuel, the father, before the children arrived at twenty-one, was either a casus omissus, and, as he had but the interest of the money during life, the principal, on his death, naturally went to them; or, if not so, that the provision is made for that event, that on Samuel’s death, he gave the principal of that part to the children. But, in construing this will, the whole scope of the intention of the testator is to be considered, and if that intention can be made out by a manifest implication from all the provisions in the will, it is the duty of the court to effectuate it. The general intention of the testator appears to the court to have been, that the whole principal in solido, should be put out by his executors to interest, and that the interest should accumulate for the benefit of the children, until they arrived at twenty-one, as well their original part as their derivative part on the death of their father. I mean the interest which would acerue after they arrived at twenty-one. The other half of the interest was to have been paid to Samuel. The children could not, when they arrived at full age, call for the principal, but only as the interest on the original part, with its accumulation from fourteen to twenty-one. The intention of the testator was, that the whole entire sum, the whole principal so put to interest, should go to Samuel’s children at the same time. If the children had come to twenty-one in their father’s lifetime, they could not have called for one half the principal, for the interest only arising after that time, is to be paid to them. One half the interest of this bequest is to the children after they arrived at twenty-one, — the other half of the interest to the father, during his lifetime, and the whole principal to them on their father’s death; the interest only payable, until they came of age. _
_ On any other construction, if the father had died before they were of the age of fourteen, they not only would have a right to the interest, but to the principal and the interest. By giving it this construction, you avoid a mischievous consequence that would follow on the other construction; for if the children had died before their father, their representative could not have demanded the principal, for it is not given them until their father’s death; but vesting the whole principal in them, — not suffering it to remain in abeyance, you accomplish all the ends of the testator. The testator, for some reason, did not wish the capital to be touched by. Samuel. Samuel was to have one half the interest during his life, the children were to have the interest of the other half, from the age of 'fourteen to twenty-one, — that was to accumulate, — the whole principal was to be theirs, instantly on the death of the testator, but to be put out to interest, and there to remain, until the happening of two events: their arrival at twenty-one, and the death of their father. The whole principal was vested in them immediately, but the principal was not payable to them until this took *323 place; and, until these events happened, it was to be put out to' interest by the executor.
Adopting this construction, on this obscure and complicated will, then the guardian could not have compelled the executor to pay the principal. If he had, and the guardian had failed, the loss would have been his. But, admitting this construction, it is further contended, that it was his duty to have compelled the executor to settle the account in the Orphans’ Court, and to give, security, although he, as guardian, had no right to receive it. On the 18th of June, 1819, the executor did settle an administration account in the Orphans’ Court, and I do not know where the authority is to be found, that vests the Orphans’ Court with power to compel the executor to give security, at the instance of one having a right to the interest, but no right to the principal until a future day. The testator has trusted the executor with the fund. The arm of a court of chancery could reach an executor in doubtful circumstances, perhaps would compel one unquestionably solvent to put the money out, according to the direction of the testator, on good security; but there are many things a court of chancery can do? which our Orphans’ Court, vested as it is with natural chancery powers, cannot accomplish. Indeed, in the case of a tenant for life of a personal chattel, chancery does not compel him to give security, but only to file an inventory. 5 Johns. Ch. 346. The same purpose was effected here by the executor’s settlement in the Orphans’ Court.
On the 18th of June, 1819, the executor settled his administration account. There is no evidence of his dubious state at that time. And within a very short lime after that, Johnson, who undertook this office at the instance of the mother and former guardian of the children, and did not obtrude himself into the office, on the 20th of February, 1820, obtains a citation from the Orphans’ Court, to show cause why he should not give security according to law; and, on the 17th of March, the court ordered him to give security, in five thousand dollars, for the faithful performance of his trust; and, on the 5th of May, 1820, the court ordered him to be discharged from the further administration of the estate; and, on the 21st of July, 1820, letters of administration de bonis non were ordered to be granted to William, E. Ashton, the husband of one of the wards; and directed the former executor to deliver up the effects, and pay the balance in his hands to the administrator. In all this, there was harmony between the executor and the guardian, and it is a circumstance of some weight, that it was not until the 20th and 21st of March, three days after the court had ordered the executor to give security, ancl one month after the application of Johnson to remove him, that this explosion of his insolvency took place; for it was then he gave judgment to the amount of eleven thousand two hundred dollars; till then he *324 had an unencumbered estate, no action had been brought against, him, nor have we any evidence but the very vague deposition oí the mother and the mother’s sister, Mrs. Wiley, of any notice to Johnson that he was in suspicious circumstances. He was, when ttie report was mentioned to him, in his gig', and a short time before the executor’s failure. If so, then he did, on hearing the ru-mour, all that was possible for man to do. He did take every legal measure, and did it in conjunction with the family; The executor was the person trusted by the testator; the mother of the. appellees ventured.to trust him, took his own note, as guardian, not payable till the end of five years; the interest on which, he paid to the appellant punctually up to January, 1819. It is the harshest demand that can be made in equity, to compel trustees to make up- a deficiency not owing to their wilful default. Jackson v. Jackson, 5 Atk. 513. It certainly is a material consideration here, that the appellant did not give the credit, that he could not compel payment, or the executor to give security for payment; that he did all his duty required of him, by citing .him to the Orphans’ Court. He had no authority to exercise; and his own oath might have been required, which would have* exonerated him, if he showed his conduct to have been regulated by prudential considerations, (2 Hob. 184,) when he did hot exceed his authority by giving credit. The cases relied on by the appellees, are 3 Johns. Ch. and 4 Johns. Ch.; the one, where the guardian lent money on personal security; the other, where administrators sold a leasehold estate, and took the purchaser’s note without security. These were their own acts, — the ab.use of their duty. It was not á debt due to the ward, and therefore want of diligence ought not to be imputed to him. The appellant was neither an executor or trustee, — had no command over the fund. In January, 1819, Sarah Keen,, Johnson’s ward, intermarried with Mr; Easton, the present administrator, with will annexed. The interest on the .note was paid up to that time; no suspicion was entertained of the executor’s insolvency. The husband was .then the proper person to look after, the executor; the guardianship was at an end on her marriage; she was taken out of the custody of the guardian; her person and estate sub potestate viri. Wright v. Wright, 2 Mass. 111. This property vested in the husband, so that , from January, 1819, when this man’s credit was not impeached, it was the husband who should have acted, and not the guardian.
On the whole view of this case, the loss by those deficiencies of the executor ought not to fall on the guardian. It is not the case of a guardian who by his wilful default, or by giving an improper credit, or by letting out money of his wards on an insufficient security, has occasioned a loss to the ward. Guardians have but a thankless office, seldom a profitable one, and while their acts should *325 be watched with a careful eye, they should not be examined by the eye of jealousy and suspicion. • Their conduct is open to investigation, but more ought not to be expected from them than a common prudential care, and they should never be made liable, unless under unfavourable circumstances; their acts expose them to the animadversion of the law, for supine negligence, showing a carelessness of duty and of the ward’s interest, or when loss is occasioned by their own act, they are bound to answer; as, by giving credit without taking security; or where they exceed their authority. Nothing like this is discoverable in the conduct of the appellant; and therefore the court think he is not bound to make good the deficiency; and, so far as respects the items against which the appellant excepted, the judgment of this court is, that decree of the Orphans’ Court be reversed.
Judgment reversed.