BENJAMIN KONIGMACHER, guardian of JACOB KIMMEL, appellant, *against* JACOB KIMMEL, appellee.

B. K., in 1815, was appointed guardian of J.; shortly after, J. W., brother-in-law of J., and administrator of the estate of his father, settled his administration account, by which a balance was found in his hands. In 1816, B. K. received part of that balance in cash, and for the residue coming to his ward, took J. W's. bond, without security. At that time J. W. was in good circumstances, he kept a store, and up to the year 1820, continued to have a large amount of real and personal property in his possession ; then he sold a tract of land, which he had bought at a very high price, at a loss of about $12,000, and shortly after, made an assignment for the benefit of his creditors, by which it appeared, that he was largely indebted. The assignees paid fifty-five per cent of his debts. Up to the spring of 1820, many of his neighbours, and among them, the mother, and another brother-in-law of J., loaned him different sums of money.

*Held*—That B. K., the guardian, was not chargeable with the loss upon the bond he had taken of J. W.

More ought not to be expected from guardians, than common prudential care; they should not be made liable, unless under unfavourable circumstances, their acts expose them to the animadversion of the law, for supine negligence, shewing carelessness of duty, and of the ward's interest: or where the loss is occasioned by their own act, in giving credit, without taking security.

If executor or administrator, sell goods of testator or intestate, and do not take security for the price, he is generally charged with the amount. If the bail or security, is a man generally reputed good for so much, it is sufficient, it is not necessary that he should be a freeholder. So if a guardian has in his hands money of his ward, and put it out, he will generally be liable, unless he take surety in the note, &c. not so if he take a mortgage on land, and an old title, unknown at the time, should sweep away the property mortgaged.

But where the fund never actually came to the hands of the guardian, there is a difference ; he is not bound instantly to sue in all directions, if to all appearance, the money is safe.

Common skill, common prudence, and common caution, are all that courts require from trustees.

In case of appeal from a decree of the Circuit Court, a *certiorari* is not necessary, nor can the prothonotary demand his fee before entering it.

This was an appeal from the decree of the Circuit Court, confirming the decree of the Orphans' Court, of Lancaster county, in the matter of the guardianship account of *Benjamin Konigmacher*, the appellant, as guardian of *Jacob Kimmel*, the appellee, charging the guardian with the amount of a bond given by *John Weidman*, to the guardian, on account of money due the ward, and which was lost by the insolvency of *Weidman*.

Upon breaking the case in this court, *Porter*, for the appellee, moved to quash the appeal, on the ground, that it had not been filed here in time. It appeared that the record of the appeal had been taken to the prothonotary in due time; but that he refused to receive it, because no *certiorari* had been issued in the case, and

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

his fee of one dollar and fifty cents, was not paid. The court overruled the motion. A *certiorari* is not necessary, nor can the prothonotary demand his fee before entering the appeal.

The exception in this court, was, the charge to the guardian of the money lost by the insolvency of *Weidman*, and at all events, to the interest on it. The decree in the Circuit Court, was made without prejudice, and with a view to a decision by the Supreme Court.

It appeared from the evidence, that *Jacob Konigmacher* and *John Weidman*, were administrators of *Jacob Kimmel's* estate, and settled their administration account in the fall of 1815. *John Weidman*, was the son-in-law of the intestate, and on the settlement of the account, had in his hands, four hundred and seventy-six pounds four shillings and six pence. *Benjamin Konigmacher*, was appointed guardian of *Jacob Kimmel*, a minor son of the intestate, on the 25th of September, 1815, and on the 1st of April, 1816, received from *Weidman*, two hundred dollars in cash, and took his bond for the residue of his ward's share. The interest was paid on this bond, at the end of the first year, but no interest was paid after that time.

In the autumn of 1820, *Weidman*, made a general assignment of his property, for the benefit of his creditors, and the assignees had paid about fifty-five per cent of his debts.

The Orphans' Court, charged the guardian with the whole amount of the bond, and interest thereon, up to the settlement of his account.

The appellant examined twelve witnesses, ten of whom were creditors of *John Weidman*, and all but two of whom had lost by him. The other two had been clerks in his store.

The proof of all, was, that *Weidman*, had a farm, and kept a store; was considered perfectly honest, was managing well, sober, industrious and by all supposed to be growing rich. No one of these had asked security from him at the time of lending their money, nor had sued him. One, who was executor of another estate, had, shortly before his assignment, got a bond on another person from *Weidman*, in lieu of his own. Another had purchased a plantation from *Weidman*, and then became a debtor instead of creditor. Two of them had lent him money in 1819, and one in the spring of 1820. The men who had been clerks in the store, proved his character, and credit, up almost to the last. The mother of him who was clerk when he assigned, had loaned *J. Weidman*, two hundred pounds, and he did not think it necessary to warn her, that it was in danger; nor did she either sue or ask security. His failure was accounted for in this way; when property was rising and very high in this county, he purchased a tract of land, at sixty-one pounds six shillings and six pence, per acre. Property fell, and he offered it for sale—at length for sale at public

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

vendue. On the 20th October, 1820, it was bid to ninety dollars per acre: *Weidman* thought it too low, and endeavoured to get a higher price, but finding he could not, he, on the 12th of November, closed with the bidder, and conveyed it. On examining his affairs, he found the loss on this single purchase, of about seventy-eight dollars per acre, had rendered him insolvent, and on the 17th of November, he made an assignment, as before stated. On that assignment was an exact list of all his creditors, and the amount due to each. The number was about thirty, and the amount exceeded fifteen thousand dollars. Many of these were bond creditors for money lent; not one of whom had asked for security at the time of the loan, nor had got it since, nor had sued him. The appellee examined the mother of the ward, two of his brothers-in-law, and took the depositions of four witnesses who had given them before, at the request of the appellant. The mother of the ward swore she had lent *Weidman* money, but never asked security—that after the sale of *Weidman's* land at a vendue, she told *Konigmacher* to secure himself—that she wished her son's money left in *Weidman's* hands—that her grandfather never liked *Weidman*, but every body else spoke well of him—that she never believed he would fail. One brother-in-law proved, that he himself had loaned money to *Weidman*, and got secured about three weeks before he assigned; that he saw *Konigmacher* and advised him to get security—but he met *Brubecker*, another brother-in-law, who told him *Weidman* was in no danger; and *Konigmacher* said he would risk it. This was about the time of the vendue. He told *Konigmacher*, he thought he could get from *Weidman*, bonds on *Barnhart;* he did not know who got those bonds; but *Barnhart* turned out to be insolvent. The other brother-in-law, who cross-examined all the witnesses on the part of the appellee, proved that he knew *Weidman* was in debt, the amount of his debts, and to whom due, in 1819: but he expressly said he never told this to any person, although he might have said he was much indebted—that he did not tell *Konigmacher*. *Keller*, as representative of *Houk's* estate had got security, about the time of the sale; but he said it is disputed whether he will recover, it is still in law. He and *Hocker*, who lent *Weidman* two hundred pounds in 1819, said the credit of *Weidman* was not so good in 1820 as it had been. *Hocker* neither applied for security, nor sued; and on cross-examination they both fixed the time in 1820, when *Weidman's* credit failed, to be about the time of the vendue, at which he sold his land at such a loss.

*Hopkins* for the appellant.

A guardian is bound to exercise the same discretion and judgment, only as a prudent man would in his own case. *West v. Skip,*

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

2 *Vesey*, 240. In order to involve a man who acts without interest as in case of a trustee or bailee, there must be gross default. *Palmer* v. *Jones*, 1 *Vernon*, 144. 2 *Fonblanque's Eq.* 180. *Osgood* v. *Franklin*, 2 *John Ch. R.* 1. 27–28.

He is not chargeable with imaginary values, or what he has not received, unless in case of gross negligence, amounting to wilful default; and courts will not strike a terror into such as act as trustees, by adopting a more rigid rule. *Bercher* v. *Parsons*, *Ambler* 219. *Thompson* v. *Brown*, 4 *John. Ch. R.* 619. 628.

Executors and administrators, acting with good faith, and not being in default, are not liable for a loss. *Brown* v. *Litton*, 1 *Peer. William*, 141.

A bailee, who derives no advantages from his undertaking, is responsible only for gross neglect. Gross neglect is the want of that care, which every man how negligent soever, takes of his own affairs. *Jones on Bailment*, 118–119.

The guardian acted in this case with good faith, and with ordinary care, which is all that is required of him. He referred also to *Pimm* v. *Downing*, 11 *Serg. & Rawle*, 66. *Johnson's Appeal*, 12 *Serg. & Rawle*, 317. *Bonsal's Appeal*, 1 *Rawle*, 260.

*Porter*, for the appellee, contended, that there had been gross negligence on the part of the guardian, that although the bond was taken in 1816, and due in one year, he did not so much as observe the ordinary care of demanding, and obtaining the payment of the interest. The neglect of the obligor to discharge the interest, was enough to put him on his guard. He went into a commentary upon the evidence, and argued, that whatever might have been the apparent circumstances of *Weidman*, up to that time, that in the spring of 1819, they were suspicious, and the guardian, notwithstanding, took no step to secure his ward's money.

If it be made out to a reasonable probability, that his ward's money is lost by the negligence of the guardian, he is responsible. *Pimm* v. *Downing*, 11 *Serg. & Rawle*, 66.

In the case in *Rawle*, there was the exercise of an erroneous judgment, but without any negligence; and in *Peer. William*, the case is of a loss in consequence of the depreciation of the land upon which the debt was secured.

*Reply.* It is the harshest thing in the world to make a trustee responsible where he is in no default. *Jackson* v. *Jackson*, 12 *Serg, & Rawle*, 324. *Jackson* v. *Jackson*, 1 *Atkins*, 513. If a man is incapable or careless by habit, it is his misfortune, but if there be fault in such case, it is of those who appoint him. Here the money was out when the guardian was appointed, in the hands of one of the members of the family, in whom they confided. He went into a view of the facts to show, that the circumstances of the obligor were ostensibly good, until he sold his land in 1820, when

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

his immense loss was revealed to him.   This calamity had its origin in the depreciation of land, which no prudence could have foreseen nor vigilance guarded against. Up to this time he had the unreserved confidence of his neighbours, proved by the fact, that so many loaned him money without security.  A prudent man would have pronounced the investment a good one, and the guardian would not, under the circumstances, have been justified in calling it in.  In leaving it in his hands, the guardian did nothing more than other men did with their own money.  Under these circumstances, to charge him with the loss, would produce that terror in guardians spoken of by Lord *Hardwicke;* and calculated to deter prudent men from assuming an office, which in itself is sufficiently onerous, and already undertaken with great reluctance.  Nothing but supine negligence should make him liable.  The case of *Pimm v. Downing,* where the guardian was exonerated, under circumstances against him much stronger than in our case, recognises the doctrine, that to charge a guardian there must be *lata culpa* or *mala fides.*

The opinion of the court was delivered by

Huston, J., (who stated the facts of the case.)   It is a matter constantly occurring in every county, that executors or guardians are charged with losses, and to settle, if possible, some rule is desirable.  Perhaps this case was so peculiar in some of the circumstances as to call for a decision, in part founded on those circumstances.  The old cases at law as to the liability of executors, guardians, &c. are of such a nature as to excite astonishment.  They would seem, by consent, to have been set up, like a cock at shrovetide, to be thrown at by all who delight in such sport. If an executor could not agree with a debtor of the estate, and to save expense, referred the dispute to arbitrators, who made a deduction from his demand, the executor was charged, and must make up this deduction out of his own pocket; and it did not avail him to prove that the deduction was properly made.   This is cited as law by *Toller,* although it has not been the law for several centuries.   It first changed to this, that a submission of a matter to arbitration, was an admission of assets; now that is not so, and it is at length considered, truly, as a mode of ascertaining matters on which the parties cannot agree.  Courts of equity early interfered in the case of executors, &c. and as they were then obliged, in every case of a recovery on a bond, to interfere to save the defendant from paying the whole penalty, so they interfered to save executors and administrators, from paying what in justice and conscience they ought not to pay.

This case has been fully and ably argued, and this court is not unanimous.  I proceed to state the ground on which the majority have come to a conclusion.  I have said the old cases are unrea-

28

Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

sonable, and are not law now.   There was a time when the affairs of executors were principally settled either in ecclesiastical courts, or in courts of law; but as the jurisdiction of chancery increased, it included, along with other trusts, the accounts, settlements and responsibilities of executors, administrators and guardians, which are now almost exclusively determined in that court.   I shall not go into all the authorities, nor trace this jurisdiction from its origin, but content myself with a few cases.   In 3 *Atkyns,* 480, *Knight* v. *Earl of Plymouth,* a receiver appointed in chancery for the rents of a minor, received seven hundred pounds, at Worcester. There being some expense and risk in remitting to London, in specie, he gave it to *Winsmore,* a trader in good credit, and took his bills on London.   The bills were protested, and *Winsmore* became a bankrupt within a week: it was proved, however, that at the time the bills were taken, his credit was as good as any man's in Worcester.   The receiver was not charged with the money, although it was urged, that not being a trustee appointed by the party, but by the law, he must answer with the utmost strictness; that he received compensation too for his services, and therefore was held to greater strictness.   In 1 *Peer. William,* 141, where an executor, without being authorized by a decree, puts out money on real security, he is not liable though the money is lost, if given on security reputed good, and no fraud.

*Ambler,* 218. *ex parte Belshier.*   The assignee of a bankrupt, who also receives a compensation, employed a broker to sell tobacco, who received the price, and about ten days after died insolvent. The commissioners of bankruptcy charged the assignee with the loss; but on application to chancery, the chancellor said, if the assignee was charged in this case, no sane man would ever become an assignee.   He entered at large into the law, referred to several cases, and came to the conclusion, that it is not necessary, in every case, to take security: if the trustees act for the trust as prudent persons act for themselves, and in the usual way of business, they are not liable.   In 2 *Vernon,* 240, *Jones* and *Lewis,* we find a still stronger case, and to the same effect—after decree to account and to pay over, an administratrix instead of going to the plaintiff and paying, left the money with her solicitor, to pay when called for; he was robbed, and she was excused.   It is again put on the ground of her acting as prudent people act in their own cases; to keep the trust fund as they keep their own.

I could trace the same doctrine through every case from that time.   In a neighbouring state, a chancellor of great eminence for learning, industry and ability, has fully adopted the same doctrine; and it is settled in New York, that executors, administrators or guardians, are not liable beyond what they *actually receive;* unless

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

in case of gross negligence. Where they act as others do with their own goods, with good faith, and not gross negligence, they are not liable; indeed the first case is stronger than that. See 2 *Johnson's Ch.* 27, *et seq.* 4 *Johnson's Ch.* 619.

This subject has been considered in this court: I shall not review all the cases. In 11 *Serg. & Rawle,* 67. 8 *Pimm* v. *Downing* and *Stalker,* we have a case much stronger than this. The money was not forced from the administrators (the mother and uncle of the ward,) for three years, and was lost; for this the guardian was not held liable: part was in the hands of the joint guardian, and by *Stalker* given to his co-guardian, who was going into trade; for this he was held liable. The principle settled in that case, is, that for gross negligence, trustees are liable, and for their own acts in not carefully securing money, which was in their hands, and put out by them; but for not sueing at once, a mother, who was an administratrix, and in good credit, or not sueing her, when they first heard of her insolvency, if no probability of recovering at that time, they were not answerable.

In 12 *Serg. & Rawle,* 317 *Johns. Appeal.* The matter was again fully considered; in that case, the grounds for charging the guardian, were stronger than in this. In 1815, he settled with the executors, and for a balance to his ward, of one thousand six hundred and seventy-two dollars, he neither took, nor asked security, but interest was paid him. In 1819, the executor settled his account, and a balance of nine thousand dollars and upwards, was in his hands; the guardian took no step to recover his ward's share, for seven months. In 1820, he applied to the Orphans' Court, to have security or that the executor should be dismissed, and he was dismissed. It is true that the money was not payable to the ward until she was twenty-one, but the executor was not cited to give security, until he was totally insolvent; yet there was no suit nor judgment against him, until after he was dismissed by the Orphans' Court, nor no evidence that he was of doubtful credit; nor of any notice to guardian, except by deposition of the widow, who had trusted him, and who, herself had no security.

It is there said, to be the harshest demand that can be made in equity, to make a trustee answerable for what never was in his hands, or to make up a deficiency not owing to his wilful default. More ought not to be expected from guardians, than common prudential care; they should not be made liable, unless under unfavorable circumstances; their acts expose them to the animadversion of the law, for supine negligence, shewing carelessness of duty and of the ward's interest, or when the loss is occasioned by their own act, in giving credit without taking security, when they sell goods or put out money in their own hands.

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v* Jacob Kimmel, appellee.)

Where executors or administrators, take possession of the goods of the deceased, and sell them, (usually in this country at auction,) it is usual to require from the purchaser, of such as are sold on credit, surety in the note; if this is not taken, the executor is generally charged with the amount, for he had the goods in his own possession: but he is not obliged to take a freeholder for bail. If the bail is a man generally reputed good for so much, it is sufficient. So if a guardian has on hand money of his ward, and puts it out, he will generally be liable, unless he take a surety in the note. I do not say, he would in all cases: *ex gratia*, if he took a mortgage on land, and an old title, unknown at the time, should sweep away the property. In short, whenever the executor or guardian, actually has the fund, and disposes of it to another, he must do it with proper and strict caution, as a prudent man would, and is seldom safe unless he does take security. But where the fund never actually comes into the hands of a guardian, all the cases make a difference; he is not bound instantly to sue in all directions: the mother, brothers, or brothers-in-law of the ward, are not to be harassed to extremity, if to all appearance, and in the general opinion, the money is safe in their hands. If adults of the family have funds in the same situation, or if other prudent men have, and consider all safe, the law does not require every possible precaution and exertion from a guardian.

An unusual rise and depression of property, occurred over most parts of this State, from 1814 to 1820, many of those who were considered, and who were of eminent skill in business, of great industry, and as honest as any of their neighbours, were ruined. It was a time in which ruin overwhelmed many of all classes, and accident had more to do in the eventual wealth or poverty of every man, than knowledge or exertion. The infatuation, as it is now called, pervaded all ranks. A few from extreme caution, a few from extreme indolence, and perhaps some few from a great superiority of mind, or experience, kept aloof. It is not right, however, to make them a standard, by which trustees, are to be held liable or not; pre-eminent knowledge or uncommon foresight, are not required. Ordinary men are to be compared with, and judged by the standard of ordinary men. Common skill, common prudence, and common caution, are all that courts have required or ought to require.

There is no proof that *Weidman*, was a general speculator; he bought a place called the Dry Tavern: no one has said he bought too high or lost by it. If he had become extravagant or intemperate, or lost his character for honesty, or if an opinion that he was failing had generally existed, the guardian ought to have sued or got security. The proof fairly viewed is, that until the sale of his

(Benjamin Konigmacher, guardian of Jacob Kimmel, appellant, *v.* Jacob Kimmel, appellee.)

Garber place, had shown a loss of above twelve thousand dollars, he was considered safe; and even then the widow did not sue, nor ask security, nor did any but two out of about twenty creditors, all of whom, we must take to be careful, prudent men.  Your money lenders, are not dull sighted, nor negligent of their interest; and no court, I think, has said that a guardian is liable unless he have more caution, more knowledge, or more foresight, than his neighbours.

No two cases of this kind can be exactly alike in all their circumstances, and therefore, courts can only give general rules.  Whether a case comes within a general rule, is a matter about which judges have differed, and will differ.   In this case, a majority of the court are of opinion, that, as he never had possession of the money, and found it in hands which the family and neighbours thought safe, it was not gross or culpable negligence, to leave it there.   As to not getting the interest, it was probably, perhaps certainly, because the ward did not need it.   The fact, that *Weidman*, was deeply indebted, though believed solvent, is answered by the case from *Atkyns*, in which he whose drafts the receiver took, was believed good, though he became bankrupt in a week.

As to not sueing after sale of the land, it is answered by *Pimm* v. *Downing*, where the guardian was excused for not sueing the administrators as soon as he heard they were indebted, because there was no evidence, he would then have got any thing.   In this case, we see no evidence, that a suit would have obtained any more than is now got.

The decree of the Circuit Court, is reversed as to all which respects the amount lost by the insolvency of *Weidman*.  The rest of the decree is affirmed.

Tod, J., dissented.

Decree reversed.