| 5   377|
|142  540|

## Swoyer's Appeal.

Testator devised lands subject to charges in favour of executors, and then bequeathed certain legacies. One of the devisees assigned for creditors, and then, with the other devisees and executor, executed an agreement apportioning the legacies among the lands devised, subject to the charges. The assignee takes the land subject to the charge.

Assignment of wife's legacy by instrument under seal, reciting a valuable consideration paid, passes the title, and an assignee for creditors of the devisee charged with the legacy is entitled to a credit for a payment to the assignee of the legacy.

Assignee for creditors selling goods on personal credit without security, to persons largely indebted, and who shortly became insolvent, is chargeable with the value of the goods, although the assignor and some of the creditors thought the sale advisable, and the exceptant was the agent conducting it.

Sales by trustees on personal credit merely, are always at their risk. Per Bell, J.

FROM the Common Pleas of ———

*June* 3. William H. Woodburn having made a general assign- ment to Swoyer, on the 31st March, 1837, for certain specified cre- ditors, his accounts were excepted to and referred to auditors.

It appeared that James Woodburn having devised his lands to his four sons, of whom the assignor was one, subject to charges in

favour of his executors; and having given legacies to his daughters, among whom was Jane Ege, an agreement was entered into by the parties in 1838, settling the amounts payable by each of the devisees to the legatees. By this instrument, the amount payable by the assignor to Jane Ege, on account of her legacy, was fixed at $733 86, due in 1838. In 1835, Joseph, the husband of Jane Ege, by deed, assigned her legacy, amounting to $2000, to Lewis, as a collateral security for a debt due. In September, 1837, by a deed reciting a valuable consideration paid, he again assigned his interest in the legacy to Watts and Biddle, and authorized the executor to pay them.

The first exception before the auditors was to the claim for credit by the assignee for the amount paid Mr. Watts on account of this legacy, $788 88. The evidence in support of the second objection to this credit was, that only $568 84 was due to Lewis at the time of the assignment to Watts and Biddle, the residue of his debt having been paid. On the other hand, Mr. Watts proved he had incurred liabilities for Ege as security, for which this legacy was assigned, and that in order to discharge Lewis's claim, he had been obliged to pay $1100. The court below disallowed the credit for reasons mentioned in the opinion of the court here: the decision of none of the points appearing on the paper-book.

The first exception to this payment was on the ground that Joseph Ege and Michael Ege were partners in trade and indebted to the assignor. The answer was, that there had been an assignment of the legacy before an election to set off, and that the present exceptant and the assignor had agreed there was this amount due at the time of the assignment to Lewis.

The second exception to the account was to a claim for credit for the loss on the two notes of Joseph and Michael Ege, given to the assignee for part of the assigned property sold on credit. The facts were these: The goods were sold in 1837. From 1835 to 1837, judgments had been obtained against Joseph and Michael Ege, amounting to $2400. They had no real estate, and had recently purchased their father's stock in certain iron works which they were conducting. The goods were not saleable, and the transaction was deemed proper and beneficial by the assignor, and was conducted by the present exceptant. In the year succeeding, owing to an unexpected failure and the fall of iron, the purchasers became insolvent, and were sold out by the sheriff. It appears the court below disallowed this claim of credit.

*Biddle* and *Watts*, for appellant, as to the first error assigned, contended, that the legacy was transferred to Mr. Watts as a security for the indebtedness of Ege to him, and that he (Watts) was entitled to receive all that was due upon it. The fact of the firm of J. & M. P. Ege's being indebted to William H. Woodburn, whose land was charged with the payment of this legacy, would not alter the case. Had Joseph Ege alone been the debtor of Woodburn, so that the statute of defalcation could have been pleaded, still that statute would not, by any operation *per se*, apply the demand of Woodburn against that of Ege, so as to produce either a payment, satisfaction or extinguishment of it; Hinkley *v.* Walters, 8 Watts, 263; and Woodburn could not, after his stipulation with Lewis that this legacy was due and would be paid, take advantage of the statute; Henniss and Page, 3 Whart. 278. But here there was no mutuality, as the claim on Woodburn's estate was by the assignee of Ege, in right of his wife, and the demand of Woodburn's estate was against the firm of J. and M. P. Ege. It is well settled that in an action by a member of a firm in his individual right, the defendant cannot set off an account against the partnership; McDowell *v.* Tyson, 14 Serg. & Rawle, 300. Swoyer, the assignee of Woodburn, therefore, was bound in law to pay this legacy, and the court was wrong in rejecting any part of the credit claimed.

As to the second error—the rejection of the credit for the amount of goods sold by the assignee and lost by reason of the insolvency of J. & M. P. Ege, they contended that voluntary assignees should not be held by so strict a rule as executors and administrators, the latter having generally in their charge the interests of widows and orphans who were incompetent to look after their affairs, whilst in the case of a voluntary assignment, the assignor and all the creditors were not only competent for that purpose, but vigilant in attending to their interests. In this sale made to the Eges, William H. Woodburn, the assignor, was by and assented to it, and testified that he thought it a good sale, and would have made it if he had had the control. George Woodburn, another of the largest creditors, was also present, made no objections, and filled up the notes for the purchase-money; and John M. Woodburn, another creditor, who is now the principal, if not only person objecting to the credit, was mainly instrumental in procuring the sale to the Eges. It would be harsh, under these circumstances, to charge the assignee, Swoyer, with the loss, and could not be done if the court adheres to the principle recognised in Konigmacher's Appeal, 1 Penna. Rep. 207; and Calhoun's Estate, 6 Watts, 189.

*Tod*, contrà.—The Eges were indebted to the assignor, and the assignee was discharged of that claim on account of their total insolvency. Before the assignment to Watts and Biddle, Woodburn had assigned for creditors. Their rights could not be affected by the subsequent transfer of a right against their assignor by one who was a debtor to him. The assignee is chargeable with the notes because there was no security taken, as is said to be usual in Konigmacher *v.* Kimmel, 1 Penna. Rep. 214. This was gross negligence, for which he is liable, the property having been in his hands and permitted to escape ; Pim *v.* Downing, 11 Serg. & Rawle, 67 ; Johnson's Appeal, 12 Serg. & Rawle, 317 ; Thompson *v.* Brown, 4 Johns. C. R. 630 ; Johnston's Estate, 9 Watts & Serg. 107 ; Dillebaugh's Estate, 4 Watts, 177 ; Verner's Estate, 6 Watts, 250. The legacies were not charged on the land, and after the assignment the devisee was incompetent to make them so ; at all events, payment beyond the amount due to Lewis was a mispayment.

*June* 9. BELL, J.—The first error assigned in the decree of the court below, relates to the reduction of the credit of $788 88, allowed by the auditors to the accountant for moneys paid Frederick Watts, Esquire, to the sum of $568 84. The facts upon which this determination of the Court of Common Pleas was based, are very imperfectly and confusedly given in the paper-books, but sufficient is shown, or was conceded on the argument in this court, to enable us to ascertain the leading features of this portion of the controversy between the assignee and the preferred creditors. [His honour here . stated the case, and the two objections to the payment to Watts.] The first of these objections has not been insisted on in this court, nor could it be with any hope of success. Admitting that the husband had, by an adequate exercise of his marital rights, so vested in himself or his assignee such an absolute interest in his wife's legacy as took away her right of survivorship, it is clear, on the authority of McDowell *v.* Tyson, 14 Serg. & Rawle, 300, and other cases, the partnership debt due to Woodburn could not have been set off against the demand for the legacy then vested in Mr. Watts. The second ground of objection, going to part of the payment only, is that which has been principally, if not solely, urged here, and this view taken by the excepting creditors was adopted by the president of the Common Pleas, who, speaking of this part of the case, says : " The proof is, that Joseph A. Ege had in part redeemed the pledge of the legacy to James Lewis, by paying him $1700, and that all he had yet to pay him on the 14th September, 1837, the date of his

assignment of it to Mr. Watts, was $568 84; and that Lewis, as well as Mr. Watts, about that date was apprized of that sum being the balance yet due by Ege for its redemption. In the absence of proof that it was subject to other liabilities in the hands of Mr. Watts than in those of Lewis, the accountant was wrong in paying more than the balance due upon it." But surely this was said without reflecting that the interest in this legacy was not transferred to Mr. Watts for the mere purpose of redeeming it out of the hands of Lewis by the payment of any balance which might remain due of the sum borrowed of the latter, but as a security for the payment of a debt due to Watts, and that the payment made by him to Lewis, though it may have been of too much, was simply for the purpose of enabling him to acquire that security. The instrument by which the right to the legacy was assigned to him and Mr. Biddle, purports to be an absolute transfer of it, without reservation, is under seal, which of itself imports a full consideration, and moreover recites that it was made for a valuable consideration. The payment of the full amount of the legacy charged on the land of Woodburn, the assignor, by his assignee, was therefore *primâ facie* correctly made, for so far as we have yet advanced in the consideration of the facts, Mr. Watts, or he with Mr. Biddle, was absolutely entitled to the whole amount due. The learned judge who pronounced the decree of the Common Pleas was therefore wrong in the position that, in the absence of proof that the claim for the legacy was subject to other liabilities in the hands of Mr. Watts than in those of Mr. Lewis, the accountant was wrong in paying more than the balance due upon it to Lewis. Upon the faith of the absolute assignment held by Watts, Swoyer was not only right in paying, but was bound to pay the full amount due from the estate of his assignor.

What matters it to that estate, or to the assignee representing it, that this might be more than was due from Ege to Watts? This was a subject with which he had no concern, and could not inquire into. If more than was due to him was thus received by Mr. Watts, it was Ege's business to call him to an account for the balance, but surely it did not lay in Swoyer's mouth to make this objection. He was bound to pay to some one, and in the absence of all notice to the contrary, who should he properly pay it to, other than him who appeared by a solemn instrument, under seal, to be the real owner of the claim. I have thus far considered this point, without reference to the deposition of Mr. Watts, taken since the case was brought into this court by appeal; and I have passed it

by because it is objected to by the appellees as incompetent testi-
mony. This opinion is based upon the ground of a supposed inte-
rest residing in the witness. But we do not perceive how Mr. Watts
is interested in the issue of this controversy. He has been paid his
demand, and having entered into no engagement to refund, he never
can be called upon to do so, whatever may be the issue, for there
is no suggestion of unfairness practised by him. But there is an-
other objection to the deposition, perhaps better founded in the
practice of this court, not to hear *new* testimony on appeals from
the courts of Common Pleas, except under peculiar circumstances.
Yet as the appellees do not raise this objection, and more espe-
cially, as it has been shown, the right of the accountant to have
restored that portion of this credit stricken out below may be sup-
ported without the deposition, it may not be improperly referred to,
as proving the debt due from Ege to Watts, and to secure the pay-
ment of which the legacy was assigned, reached to upwards of $500,
which, added to the sum confessed by Ege to be due to Lewis, of
$568 84, would make a much larger aggregate sum than was paid
by Swoyer.

. The decree of the court below is therefore to be reformed by re-
storing the credit allowed by the auditors to the accountant, of
$788 88, with interest from the 14th of September, 1837; but
which was reduced by the Court of Common Pleas to the sum of
$568 84.

The appellant avers, secondly, that the court erred in rejecting
the credit allowed to him by the auditors, of $637 03, being the
amount of two notes drawn by J. A. and M. P. Ege, and taken by
him in payment of certain store goods, which had passed to him by
virtue of the assignment, and were sold by him to the drawers on the
13th May, 1837. This exception involves the question whether the
fact of making this sale and accepting the simple notes of the pur-
chaser, without other security for the purchase-money, presents a
case of such gross negligence, on the part of the accountant, as is
sufficient in Pennsylvania to charge him with the loss that has hap-
pened. The subject of the liability of trustees to answer for losses
of the trust fund, has often engaged the attention of our courts, and
frequent decisions have been pronounced. It cannot, perhaps, be
said that the inclination of our judges has always been uniform,
for it is apparent, that while some have favoured a somewhat strict
rule of accountability, others have leaned towards a more indulgent
principle as proper to govern in such cases. Notwithstanding this
diversity, the course of decision has been sufficiently steady to ena-

ble us, without much difficulty, to arrive at just conclusions in the instances ordinarily presented for adjudication.

It is said to be the harshest demand that can be made in equity, to seek to charge a trustee with imaginary values, and it must be a very gross case indeed, which will induce a chancellor to hold him liable for moneys or goods he has never received, more especially when he has trusted to the same security in which the creator of the trust placed his confidence; Pim v. Downing, 11 Serg. & Rawle, 67; Johnson's Appeal, 12 Serg. & Rawle, 317; Konigmacher v. Kimmel, 1 Penna. Rep. 214. But all the cases distinguish between the liability of non-receiving trustees, and the accountability of those who have actually reduced the trust property to possession, and afterwards parted with it, without adequate security. In the latter instance they are, or ought to be, held to a more rigid account, and will not be exonerated, except where they have acted with the care, caution, and prudence, which should characterize the transactions of a man of good business habits in conducting his own affairs; Pim v. Downing, *supra;* Nyce's Estate, 5 Watts & Serg. 254. In England, in the case of a sale of personal goods by a trustee, the rule established in equity requires him to exact cash payments. Owing to the peculiar situation and habits of our country, we have so far relaxed this rule as to allow a trustee to make sales at a credit, exacting, however, from the purchasers, security for payment at the expiration of the credit agreed upon; Johnston's Estate, 9 Watts & Serg. 107. But it has ever been held, that when he omits to require this security, he shall be liable to make good any loss which may consequently accrue. Even Mr. Justice Huston, who was willing to go as far as any one in shielding trustees from liability, in Konigmacher v. Kimmel, where great indulgence was extended to the guardian, agreed that trustees are liable where a loss is occasioned by their own act, in giving credit without taking security, when they sell goods, or put money out of their own hands. After noticing the practice which obtains with us, of taking notes with security, for goods sold at auction by trustees, he observes, if security be not taken, the executor—and the remark is equally applicable to other trustees—is generally charged with the amount, for he had the goods in his own possession. This rule, here and elsewhere announced, is, if possible, of more stringent operation where the vendee of the goods is engaged in merchandizing or other hazardous employment liable to fluctuations and ruinous disasters, as is often the case in the business of manufacturing iron; and of which the failure of the Messrs. Ege is a pregnant exam-

ple. As is ruled in Thompson *v.* Brown, 4 Johns. Ch. Rep. 630, to put trust assets into the hands of a merchant in trade, without any security, is exposing the trust fund to unreasonable jeopardy. The policy of the law will not permit a trustee to deal in that loose way with the fund. It becomes a distinct appropriation of his own, and if a loss accrues, he will be liable. Had there then been nothing more in the present case than a sale by the trustee to J. A. and M. P. Ege of the stock of store goods, upon a credit, without other security for payment than their own notes, he ought beyond question, upon the principle indicated, to be charged with the loss that has resulted from his own carelessness. But beyond this, the case presents peculiar features. The purchasers were two young men, just entering upon a hazardous business, the owners of no real estate, and at the time of the sale to them, indebted to an amount exceeding $20,000. The auditors report the fact that at this moment they were insolvent. Between the years 1835 and 1837, inclusive, judgments had been rendered against them in Cumberland county, where all the parties resided, to the amount of $24,000, and this must have been known to Swoyer, the assignee. Loaded with this burden, it is evident they progressed with difficulty until, meeting a sudden revulsion in the business in which they were engaged, they succumbed, and publicly failed, within less than a year after the sale of the goods to them. But the assignee seeks to escape from the liability this state of things imposes, by showing that the sale and purchase of the goods in question was consummated under the direction, and with the approbation of John M. Woodburn, who, it is said, has an interest in at least some of the preferred debts, which await payment out of the fund with which it is now asked this trustee may be charged. Two answers are given to this defence. The first is, that at the time of the sale Woodburn was in the employment of the purchasers, and evidently acted as their agent in the transaction; and the second, that it is not shown he is personally interested in the preferred debts, nor is it even suggested that he is the actual owner of all of them. On the contrary it is admitted, many of the creditors of the second class, who have an interest in this question, are represented in this court, claiming to have the accountant charged with the loss which has occurred.

For these reasons this portion of the decree of the Court of Common Pleas is affirmed.

Decreed accordingly.